liMARVIN, Chief Judge.
In this action for the balance due on a 26-week contract to mow roadways, levee berms and other locations on a 19,000 acre agricultural tract, the contractor, Gordon McQuillin, appeals a judgment rejecting his demands against the owner.
Within two or three weeks after the contract was executed April 18, 1991, the Oua-chita River flooded, inundating all but a few acres of the property, about 15,000 acres of which were inside the levee. The flood waters slowly and slightly began receding in late June or early July, through August and September, but did not fully recede from the entire 19,000 acres until October 1991. Because of the devastation of the flood, none of the several lessees who planted farm tracts within the 19,000 acres produced a crop.
The issues may be stated in terms of the extent to which plaintiff performed under the contract and whether plaintiff, who was paid more than $15,000 on the $33,000 contract, was overpaid or underpaid, considering the impossibility of fully performing the contract for the 26-week period. C.C. Arts. 1877, 1878.
Viewing the factual record in the light that most favorably supports the judgment, we affirm.
FACTS
The owner, through his farm manager, Jesse Clifton, executed the contract with McQuillin, April 18,1991. This contract obligated McQuillin to mow the farm’s roadways, ditch banks, canal banks, headquarters, hunting Rlodge and inside berm on the protection levee for $33,000 consideration to be paid in 26 weekly installments of $1,269.23. Par. 7 of the contract provided:
If the mowing is not meeting Owners satisfaction, Owner shall have the right to stop the mowing at a weekly basis. The Contractor will mow at the rate of $25 per hour per tractor as directed by Farm Manager.
McQuillin began mowing the headquarters and hunting lodge areas before the flood. He was paid $1,269.33 a week on April 24, April 30 and May 7, and awaited instructions from Clifton when to begin mowing the other areas. Before May 7, however, the levees failed and the river quickly inundated virtually all 19,000 acres the litigants called Mollicy Farms. Headquarters was spared and the water receded fairly quickly from the hunting lodge. McQuillin continued to mow these areas when he could about every two weeks, as directed. After May 7 McQuillin was paid $634.67 each week through September 16, 1991.[1] Clifton said the owner wanted to opt for the $25 hourly wage after the flood, but allowed Tom Cole, the general manager over Clifton, to pay McQuillin half of his weekly wage instead.
According to Clifton, who inquired to McQuillin around May 15 about paying him only one half of the weekly payment because of the flood, McQuillin responded, “That’s better than nothing,” and accepted the first of many weekly checks for $634.67.
Clifton, who no longer worked for the owner of Mollicy Farms when the case was tried, *240 opined that McQuillin, after the flood, at $634.67 per week, made closer to $100 an hour than the $25 per hour mentioned in the |3contract, and “had he been able to fulfill the full mowing contract he would have had less profit than he got by getting half of [the contract amount].”
McQuillin acknowledged that he was not to start mowing the road banks, ditches and levees until July but that he was mowing around the headquarters area and the hunting lodge area about every two weeks for some period of time he could not remember. He estimated those areas were about 35 total acres.
McQuillin denied telling Clifton that one half pay “beats nothing,” but remembered a conversation with MeQuillin’s supervisor, Cole, who told him something to the effect that the owner “wasn’t going to pay you to mow things that you couldn’t get to to mow.” Of the 120 plus miles of dirt roadways in the Mollicy Farms, McQuillin said he mowed the lots at the headquarters and the hunting lodge areas before and during the flood and about a “half a quarter” [either “or a mile” or “of a mile”] of roadway in front of the lodge. He said he did not mow the banks of the ditches, the canals, or the berm of the levees before or after the flood.
McQuillin estimated that he would have made about “$10,000 to $12,000 profit” on the $33,000 contract if he had been able to fulfill the contract. At best McQuillin estimated that he mowed the headquarters area of about “20 acres” every two weeks (April through mid-September) and mowed the hunting lodge area “about the same ... except for maybe 35 or 40 days [when] the water was over it.”
DISCUSSION
When a fortuitous event has made a party’s performance [of a contract] Uimpossible in part, the court may reduce the other party’s counterperformance proportionally, or, according to the circumstances, may declare the contract dissolved. C.C. Art. 1877. If a contract is dissolved because of a fortuitous event that occurred after an obligor has performed in part, the obligee is bound but only to the extent that he was enriched by the obligor’s partial performance. Art. 1878.
These codal principles effectively mandate the result adjudicated below. McQuillin was able to perform only in part because of the flood. The owner benefitted or was enriched by McQuillin’s partial performance, but to a lesser extent than the $15,000 plus that the owner paid McQuillin, “according to the circumstances” of this record.
McQuillin’s demands were properly rejected.
DECREE
At appellant’s cost, the judgment rejecting MeQullin’s demands is AFFIRMED.

. McQuillin did receive one more check for $1,269.33 on July 24, 1991. In addition, two checks for odd amounts, $425.00 and $325.00, dated October 2 and 16, respectively, appear in the record. The $325.00 figure included 11.5 hours of work performed outside of the contract at issue. McQuillin could not recall the work that the $425.00 check represented. Mollicy Farms paid McQuillin a total of $16,032.04 in 1991.